IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    v.                                   CRIMINAL CASE NO.
                                           1:25-CR-499

SAMUEL TUNICK

## MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS

The Defendant, Samuel Tunick, through undersigned counsel, moves this Court to suppress statements and evidence obtained in violation of Mr. Tunick's constitutional rights.

First, Mr. Tunick's statements should be suppressed because they were obtained in violation of the Fifth and Sixth Amendments. Mr. Tunick provided officers with the password to his phone and e-reader during a custodial interrogation, during which Mr. Tunick was not provided with *Miranda* warnings and repeatedly invoked his right to an attorney and requested an end to his questioning. For the government to use any statements attributed to Mr. Tunick, it must first prove that his statements were made voluntarily and not in violation of his Fifth and Sixth Amendment rights. *Jackson v. Denno*, 378 U.S. 368, 376-377 (1984); *Miranda v. Arizona*, 384 U.S. 436-468, 69 (1966); and *Escobedo v. Illinois*, 378 US 478 (1964).

1

Second, because the officers violated Mr. Tunick's constitutional rights in during their interrogation of him, evidence obtained from Mr. Tunick's phone—or lack thereof—should be suppressed as fruits of unlawfully obtained evidence. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1281 (11th Cir. 2003); *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963).

Third, any evidence obtained from Mr. Tunick should be suppressed as the product of an unreasonable, warrantless search and seizure that violated the Fourth Amendment. *See Riley v. California,* 573 U.S. 373 (2014); *United States v. Aigbekaen*, 943 F.3d 713 (4th Circ. 2019).

Though the officers' detention, interrogation, and search of Mr. Tunick and his property occurred at Hartsfield-Jackson Atlanta International Airport, officers were not permitted to disregard all constitutional protections afforded to Mr. Tunick simply because he was at the border.

## BACKGROUND

The one-count indictment alleges that Mr. Tunick destroyed the "digital contents" of his cellular phone to prevent an officer of the Customs and Border Patrol Tactical Terrorism Response Team (CBP TTRT) from searching and seizing the contents of his phone.[1] (Doc. 1). On January 24, 2025, FBI Atlanta Joint

---

[1] Title 18 U.S.C. 2232(a) prohibits one from knowingly destroying, damaging, wasting, disposing of, or transferring property for the purpose of preventing or

Terrorism Task Force Officer Burnham and FBI Special Agent Andrea Coble coordinated with CBP to question and search United States Citizen, Samuel Tunick, as he was returning to the United States from the Dominican Republic. (Tunick_55).

The government was investigating Mr. Tunick because of his association with an environmental movement known as Defend the Atlanta Forest, which opposed the destruction of the South River Forest for the construction of an 85-acre, $115 million police training facility known as the Atlanta Public Safety Training Center. (Tunick_54). While the government depicts the Defend the Atlanta Forest movement as an "Anti-Government, Anti-Authority Violent Extremist Group" ("AGAAVE"), it has not put forth evidence that Mr. Tunick was involved in criminal activity in connection with the Defend the Atlanta Forest movement. (Tunick_6, 54).

When Mr. Tunick arrived at the airport on January 24th, CBP placed him in secondary inspection. (Tunick_52). CBP's Tactical Terrorism Response Team proceeded to question Mr. Tunick, searched Mr. Tunick's body and all his belongings, and insisted that he provide the passcode for his phone. Despite Mr. Tunick's request to speak with his lawyer and not engage in further questioning,

---

impairing the Government's lawful authority to take such property into its custody or control by a person authorized to make such search or seizure.

the officers insisted that they could question Mr. Tunick and search his phone to determine whether he had child porn. Evidently, this was a pretext for a fishing expedition into Mr. Tunick's connections with the Defend the Atlanta Forest movement.

The two CBP officers conducting the initial interrogation of Mr. Tunick never read him his *Miranda* rights and, further, Mr. Tunick stated early in the interview that he did not want to continue speaking without a lawyer. Yet the officers repeatedly ignored Mr. Tunick's requests to speak with his lawyer, continued to question him, and declared: "because you're refusing to talk, which is your right, we have the authority to go through your phone to see what we're looking for." [Timestamp 20:00:40].

After the officers requested Mr. Tunick's cell phone password a second time, Mr. Tunick asked *again* why he was not allowed to call his lawyer, and the officers responded: "when it comes to immigration and customs, right, it's a whole different ballgame. . . and we have search authority, we don't need a warrant." [Timestamp 20:05:09].

The CBP officers explained that Mr. Tunick would have to give the officers access to his phone, whether it was done with his cooperation or not and, eventually, Mr. Tunick provided a password to his cell phone and e-reader. According to the government, when the CBP officers entered the password on

his cell phone, "the screen went blank, flashed several times and the phone appeared to restart." (Tunick_07).

After they attempted to search Mr. Tunick's phone and inspected every item in his bag, a third officer entered the room to conduct a "pat down" of Mr. Tunick. [Timestamp 20:29:00]. Mr. Tunick responded that he did not consent to the search of his body but, recognizing that he had no choice in the matter, the officers escorted him to another room for the search. [Timestamp 20:29:27]. The officer's search of Mr. Tunick was not recorded, but when Mr. Tunick returned, the camera captured him putting back on his sweatshirt. [Timestamp 20:34:51].

Finally, an agent from the Department of Homeland Security (DHS), along with three additional agents, arrived to conduct another interview of Mr. Tunick. Mr. Tunick declined to be interviewed and pointed to his attorney's card already placed on the table. [Timestamp 20:35:35]. The agent explained that he was seizing Mr. Tunick's electronic devices and they would be returned to Mr. Tunick after thirty days. Notably, the DHS agent explained that Mr. Tunick was "not under arrest but once these gentleman are done with you, pursuant to your entry into the country, you're free to leave." [Timestamp 20:35:15]. The DHS agent stated this *after* the CBP officers had pressured Mr. Tunick to provide his cell phone password and, more importantly, the DHS agent said Mr. Tunick was free to leave only after "these gentlemen" (the other agents in the room) were

done with Mr. Tunick. In other words, Mr. Tunick was not free to leave at any time.

**I.      Officers violated the Fifth and Sixth Amendment by interrogating Mr. Tunick without administering *Miranda* warnings and disregarding Mr. Tunick's request to speak with his attorney.**

To protect the Fifth Amendment right against self-incrimination, *Miranda* requires all individuals who are in police custody to be informed prior to interrogation of their right to remain silent and to have an attorney present during questioning. *Miranda v. Arizona*, 384 U.S. 436 (1966). An interrogation is custodial when "under the totality of the circumstances, a reasonable man in the defendant's position would feel a restraint on his freedom of movement to the extent that he would not feel free to leave." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).

With respect to interrogations at the border, the Eleventh Circuit has stated that "questioning at the border must rise to a distinctly accusatory level" before a reasonable person would feel restraints on their ability to leave. *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). The government has the power to police national borders, and as such, the Fifth Amendment guarantee against self-incrimination is not violated by routine questioning of those seeking entry to the United States. *United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982).

While an interrogation at the border might begin as non-custodial in nature, when officers start accusing a defendant of criminal activity, a reasonable person could feel a degree of restraint comparable to arrest. At that point, the interview can become custodial in nature, and the officers are required to administer *Miranda* warnings. *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011). In *Jayyousi*, the Eleventh Circuit reasoned that defendant Padilla's initial interrogation at the border was not custodial in nature: he was not handcuffed, not physically held or moved, nor was he told that he was not free to leave; nothing indicated that Padilla asked to leave, or see a lawyer, before the agent's accusation that Padilla was linked to terrorist activities. *Id.* at 1110. However, once the agent accused Padilla of terrorist activities, "the interrogation became custodial, and it is evident by Padilla's reaction to [the agent's] accusation—he stood up and announced that the interview was over." *Id.*

Here, the CBP officers introduced themselves to Mr. Tunick and explained that they were "looking for people who are pedophiles." [Timestamp 19:49:00]. The officers never read Mr. Tunick his *Miranda* rights. The officers justified their questioning and demands to search Mr. Tunick's phone by stating that they had to confirm whether he possessed child porn. The officers never provided any details as to why they purportedly suspected Mr. Tunick was harboring such contraband. The government's reports do not indicate any suspicion *whatsoever*

that Mr. Tunick was in possession of child porn but, rather, that their purpose in detaining Mr. Tunick and seizing his belongings was to investigate his ties with the Defend the Atlanta Forest movement. (Tunick_54).

Although the officers' accusations that he possessed child porn were pretextual, the officers were nevertheless accusing him of criminal activity. These accusations, combined with the fact that the officers continued to steamroll Mr. Tunick's requests to end questioning and speak with a lawyer, illustrate how a reasonable person in Mr. Tunick's position would not feel free to leave. Mr. Tunick was not free to leave because he was being subjected to custodial interrogation—requiring officers to inform him of his *Miranda* rights.

The Eleventh Circuit has held that an individual's act of decrypting and producing a hard drive's contents is sufficiently testimonial to trigger Fifth Amendment protection. *In re Grand Jury Subpoena Duces Tecum*, 670 F.3d 1335, 1352-53 (11th Circ. 2012). Similarly, requiring Mr. Tunick to provide a passcode for the officers to search through his phone is sufficiently testimonial to trigger Fifth Amendment protection. However, Mr. Tunick was never informed of his *Miranda* rights. Further, because Mr. Tunick's repeated requests to speak with a lawyer were denied while he was under custodial interrogation, his Sixth Amendment rights were violated. *Escobedo v. Illinois*, 378 US 478 (1964).

8

As such, Mr. Tunick's statements should be suppressed as involuntarily made and in violation of the Fifth and Sixth Amendments. *Jackson v. Denno*, 378 U.S. 368, 376-377 (1984); *Miranda v. Arizona*, 384 U.S. 436-468, 69 (1966).

## II.    The evidence obtained from Mr. Tunick's cell phone should be suppressed as the fruit of his unlawful interrogation.

Officers violated Mr. Tunick's constitutional rights in their interrogation of him and, in turn, evidence obtained from Mr. Tunick's phone (or lack thereof) should be suppressed as fruits of his unlawful interrogation. The fruit of the poisonous tree doctrine, which requires suppression of evidence derived from other unlawfully obtained evidence, can apply beyond the Fourth Amendment context. For example, evidence derived from an involuntary statement should be excluded from trial as fruit from the poisonous tree. *United States v. Lall*, 607 F.3d 1277 (11th Cir. 1985).

In *United States v. Patane*, the Supreme Court denied suppression of the non-testimonial fruits of a statement obtained in violation of *Miranda*. *Patane*, 542 U.S. 630 (2004). Yet *Patane* is distinguishable from Mr. Tunick's case. First, the fruit of Mr. Tunick's un-*Mirandized* statement—the alleged "wiping" or encryption of the contents of his phone by providing agents with a specific password—is testimonial in nature. *See In re Grand Jury Subpoena Duces Tecum* at 1352. Second, unlike in *Patane*, where the defendant interrupted the detective while he was administering his *Miranda* rights, and the defendant never invoked

his rights to an attorney, the CBP officers never attempted to advise Mr. Tunick of his *Miranda* rights and ignored his requests to speak with his attorney. *See United States v. Owens*, 2009 WL 2584570, at \*4 (N.D. Fla. Aug. 20, 2009) (determining that *Patane* was not controlling because the officers never attempted to advise the defendant of his *Miranda* rights prior to interrogation). Third, the officers' search and seizure of Mr. Tunick's phone is significantly more intrusive than the seizure of defendant Patane's firearm. *See Riley v. California*, 573 U.S. 373 (2014). Unlike the search of a bag or physical items, a cell phone can reveal the "sum of an individual's private life." *Riley*, 573 U.S. at 386, 393-94.

*Patane* is factually inapposite of Mr. Tunick's case and, therefore, his phone and its contents—or more accurately, his alleged "wiping" of the contents of the phone by providing a specific password to the officers—should be suppressed as the fruit of Mr. Tunick's unlawful interrogation.

### III. The evidence obtained from Mr. Tunick's cell phone should be suppressed as the product of an unreasonable search and seizure under the Fourth Amendment.

The Supreme Court has expressed that the primary justification for warrantless searches at the border is to prevent contraband from entering the country. *See United States v. Montoya de Hernandez*, 473 U.S. 531 (1985); *Carroll v. United States*, 267 U.S. 132 (1925). Nonetheless, the Eleventh Circuit has held that a forensic search of electronic devices at the border is constitutional despite the

10

lack of a warrant, probable cause, or individualized suspicion. *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018).

Generally, the Eleventh Circuit applies a two-step analysis to evaluate the legality of a border search. *United States v. Pulido*, 133 F.4th 1256, 1273 (11th Cir. 2025). The first step focuses on whether there was statutory authority to conduct the search, and the second step asks whether the search was reasonable under the Fourth Amendment. *Id.* As the level of the search's intrusiveness increases, the amount of suspicion needed to justify the search should increase.

However, the Eleventh Circuit's decision in *Touset* contravenes the primary principal behind warrantless border searches. The notion that suspicion-less searches of phones at the border are permissible to prevent contraband from entering the country is unwarranted. Unlike physical contraband such as drugs, digital contraband can exist in multiple locations and formats and is easily transported across borders via the internet. In the case of Mr. Tunick, where the accusation is that he destroyed the digital contents of his phone, where was the threat of contraband entering the country? There wasn't one.

Rather, in Mr. Tunick's case, law enforcement coordinated and planned his detention before he arrived at the airport. The purpose of his detention at the airport was to investigate domestic crimes connected with opposition to the Atlanta Public Safety Training Center's construction in the South River Forest.

Mr. Tunick has not been charged with committing a crime in connection with the Defend the Atlanta Forest movement, but law enforcement seemingly took advantage of the relaxed constitutional protections at the border to try to dig up evidence against Mr. Tunick, and possibly others connected to the movement. While the Eleventh Circuit's decision in *Touset* suggests that it is permissible for law enforcement to circumvent a person's constitutional rights by investigating domestic crime through warrantless searches and seizures at the border, other circuits disagree.

The Fourth Circuit has held that warrantless searches of digital devices at the border may not be justified to search for evidence of a crime, even if there is probable cause that the defendant committed the criminal offenses in the country. *United States v. Aigbekaen*, 943 F.3d 713 (4th Circ. 2019). Indeed, the Eleventh Circuit's decision in *Touset* is inconsistent with other circuits' decisions on warrantless border searches. *See United States v. Qin*, 57 F.4th 343 (1st Cir. 2023) (holding that a non-routine search must be supported by reasonable suspicion that the search will uncover contraband or evidence of a crime); *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) (stating that borderless warrant searches are not permissible for purposes of general crime investigation); and *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) (holding that articulable suspicion is required

for an "intrusive" forensic search of a digital device and that a border search is not a vehicle for criminal law enforcement).

In conclusion, Mr. Tunick respectfully requests that the Court (1) issue an order suppressing all unconstitutionally obtained statements and evidence; (2) grant the Defendant a suppression hearing; (3) allow additional briefing on this issue if there is an evidentiary hearing or additional evidence on this matter; and (4) grant such other relief as may be just under the circumstances of this case.

Dated:  This 17th Day of March, 2026.

Respectfully Submitted,

*/s/ Melissa McGrane*
Melissa McGrane
Georgia State Bar No. 878384

Federal Defender Program, Inc.
(404) 688-7530; Fax: (404) 688-0768
Melissa_McGrane@fd.org

13