IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v. CRIMINAL CASE NO. 1:25-CR-499

SAMUEL TUNICK

**POST-HEARING BRIEF ON MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS**

Samuel Tunick, an American citizen, traveled to the Dominican Republic in the winter of 2025. While there, he experienced all the beautiful country has to offer. He spent his days laughing with friends, trying new foods, and breathing in the fresh, salt-laden air. Like all good things, his time in Puerto Plata came to an end. And as he packed his bags and said goodbye to his new acquaintances, he was happy: he was excited to return to the United States.

That joy was short-lived. As soon as he landed at Hartsfield-Jackson International Airport, Mr. Tunick was seized by law enforcement, taken to a private room, and accused of potentially committing a serious federal crime. Mr. Tunick repeatedly asked for his attorney. He also told law enforcement that he did not want to speak to them, and he denied committing any crimes.

The interrogation should have stopped there. Instead, the officers continued peppering him with questions. They ignored his repeated requests to

speak with his lawyer. They took his belongings from him and searched his items, even going through his journal and taking pictures of his writings. And most relevant to this case, they demanded the passcode to his cell phone without having a warrant—let alone probable cause—to search the device's contents.

There can be no real debate that if law enforcement had acted similarly elsewhere in Atlanta, their actions would be unconstitutional. But the government says it was entitled to act this way because Mr. Tunick was returning from an international vacation.

This Court should reject that suggestion. Mr. Tunick's statements were elicited during a custodial interrogation. And despite the Supreme Court's instructions in *Miranda v. Arizona*, 384 U.S. 436 (1966), Mr. Tunick was not provided with the warnings that the Constitution requires. This Court must suppress (1) Mr. Tunick's verbal statements—including the provision of a passcode—and (2) any fruits of those statements, as both categories of evidence were secured in violation of the Fifth Amendment.

Similarly, any potential fruits of the interrogation should be suppressed because officers violated Mr. Tunick's Fifth and Sixth Amendment rights. He repeatedly asked for his attorney throughout the interrogation. Officers should have stopped questioning him as soon as he invoked that right. But they refused

to do so. This blatant violation of Mr. Tunick's constitutional rights warrants suppression.

Finally, law enforcement officers violated Mr. Tunick's Fourth Amendment rights when they conducted an unreasonable, warrantless search of his belongings, including his cell phone. The government says the Fourth Amendment does not apply at the border, a loophole that allowed them to manufacture Mr. Tunick's detention and confront him in a private room at the airport.

They are wrong. The Fourth Amendment—at least for U.S. citizens passing through an airport—must be as robust in its protections at the border as it is everywhere else. Eleventh Circuit case law to the contrary was wrongfully decided. Because law enforcement officers violated Mr. Tunick's Fourth Amendment rights, evidence obtained from their unconstitutional search must be suppressed.

**BACKGROUND**

The one-count indictment alleges that Mr. Tunick destroyed the "digital contents" of a cellular phone to prevent a Customs and Border Patrol ("CBP") officer from searching and seizing the contents of the device.[1] (Doc. 1).

---

[1] 18 U.S.C. § 2232(a) prohibits knowingly destroying, damaging, wasting, disposing of, or transferring property for the purpose of preventing or impairing

On January 24, 2025, Mr. Tunick boarded a plane set to land in Atlanta. Unbeknownst to Mr. Tunick, the National Targeting Center had issued a "lookout" for him. (Doc. 34 at 23).[2] Three hours before Mr. Tunick's arrival, Officer Mcghie, a task force officer working with the Department of Homeland Security ("DHS"), sent an email directing CBP officers to seize Mr. Tunick, question him, rifle through his belongings, collect his passcodes and keep his devices:

**From:** Mcghie, Travis A <Travis.A.Mcghie@hsi.dhs.gov>
**Sent:** Friday, January 24, 2025 4:23 PM
**To:** ATL CHIEFS-HFA002A <ATLCHIEFS-HFA002A@cbp.dhs.gov>
**Cc:** Johnson, Natashya M <Natashya.M.Johnson@ice.dhs.gov>; Burnham, Nathan A <Nathan.A.Burnham@ice.dhs.gov>; Stewart, Wendi <Wendi.Stewart@ice.dhs.gov>; MCGHIE, TRAVIS A <TRAVIS.A.MCGHIE@CBP.DHS.GOV>
**Subject:** HSI BEST Secondary Request arriving today 1/24/2025 via DL 1778 @ 19:30 Hours

Good afternoon

The following subject is scheduled to arrive in ATL today via DL 1778 @ 1930 Hours. TUNICK is under investigation by HSI/JTTF for suspected terrorist activities. Please have Baggage secondary conduct a 100% baggage exam, retain all electronics and collect passcodes. TUNICK already has a 1day l/o for CTR and multiple prim hits. HSI Agents will be on site to conduct an interview and detain devices post CBP inspection.



| | |
|---|---|
| Name: | TUNICK, Samuel Breakstor |
| Date of Birth: | [redacted] |
| Sex: | Male |
| Place of Birth: | CA - CALIFORNIA USA |
| Passport #: | [redacted] |
| Passport Type: | — |
| Document Type: | U.S. PASSPORT CARD (IP) |
| Document Country: | USA |
| Issued City: | — |
| Issue Date: | 05/22/2023 |
| Expiration Date: | 05/21/2033 |
| Document Status: | ISSUED |

Thank you
Travis McGhie
CBP/HSI TFO
Atlanta, GA
678-209-4213

---

the government's lawful authority to take such property into its custody or control by a person authorized to make such search or seizure.

[2] Page citations refer to the CM/ECF numbers of the cited docket entry.

(Gov. Ex. 5; Doc. 34 at 51–52).[3] And while Officer Mcghie's email says that Mr. Tunick was being investigated for "suspected terrorist activities," the message is devoid of any evidence supporting that claim. (*See* Gov. Ex. 5).

When Mr. Tunick arrived at the airport on January 24th, CBP placed him in secondary inspection. (Doc. 34 at 22). An officer—not a civilian—escorted Mr. Tunick to a private inspection room. (Doc. 34 at 17, 23, 34). There, CBP's Tactical Terrorism Response Team interrogated Mr. Tunick, searched his body and his belongings, and insisted that he provide the passcode for his phone. (Doc. 34 at 24–25, 29, 71).

The interrogation began with two officers: Officer Findley and Officer Castro. (Doc. 34 at 24). When Mr. Tunick told the officers that he didn't want to fill out the paperwork they gave him, CBP Officer Findley told him that he would be free to leave if he gave them everything they asked for. In Findley's words, "For this inspection, I need as much information as I can get from you and the sooner we get this information, the sooner we can leave." (Gov. Ex. 1 at Timestamp 19:54:45).

---

[3] Sensitive information has been redacted in accordance with the Northern District of Georgia's redaction standing orders.




(Gov. Ex. 1 at Timestamp 19:54:47).

The officers were armed during the interview, and their firearms were visible to Mr. Tunick. (Doc. 34 at 55). Despite his requests to speak with his lawyer and not engage in further questioning, the officers insisted that they could question Mr. Tunick and search his phone to see if he possessed child pornography. (Doc. 34 at 26–28).

As the evidentiary hearing made clear, these unfounded accusations were nothing more than pretext for a fishing expedition into the depths of Mr. Tunick's devices. Officer Findley acknowledged that officers had no reason

whatsoever to believe Mr. Tunick possessed child pornography. (Doc. 34 at 27, 36). When they asked Mr. Tunick if they were going to find "kiddie porn" on his phone, he immediately denied the suggestion. (Gov. Ex. 1 at Timestamp 19:55:58) Still, the officers followed up by asking him again if he had anything like that in his possession. (Gov. Ex. 1 at Timestamp 19:56:05) Despite these accusations and baseless suggestions, nothing illegal was ever found in Mr. Tunick's possession. (Doc. 34 at 72).

The two CBP officers conducting the initial interrogation of Mr. Tunick never read him his *Miranda* rights. Even so, Mr. Tunick invoked one of those rights almost immediately, telling the officers, "I don't really want to speak without a lawyer anymore." (Doc. 34 at 39). Yet they ignored Mr. Tunick's repeated requests to speak with his attorney. (*See, e.g.*, Doc. 34 at 40–43). Officers continued to question him, eventually declaring: "Because you're refusing to talk, which is your right, we have the authority to go through your phone to see what we're looking for." (Gov. Ex. 1 at Timestamp 20:00:40).

The CBP officers explained that Mr. Tunick would have to give the officers access to his phone—whether it was done with his cooperation or not. Officer Castro presented two "choices": "Either you can give us your password so we can go through it with no problem, or you can refuse to do that and, unfortunately, we will have to seize your phone. Give it to the FBI." (Gov. Ex. 1

at Timestamp 20:01:05). If he refused to give them his password, Officer Castro explained, the FBI would break into the seized phone at a later time. (Gov. Ex. 1 at Timestamp 20:01:15). Mr. Tunick asked again if he could speak to his lawyer, to which Officer Castro replied, "Not at this moment, no." (Gov. Ex. 1 at Timestamp 20:01:30). The officers made it clear that they planned to follow DHS's orders: seize the electronics, collect the passcodes, and give the devices to agents after the manufactured border search.

Eventually, Mr. Tunick provided a passcode to his cell phone and e-reader. According to the officers, when they entered the passcode on his cell phone, the device appeared to reset and "shut off." (Doc. 34 at 32, 86) After the officers entered the password on Mr. Tunick's phone and successfully inspected every item in his bag, they conducted a nonconsensual pat-down of Mr. Tunick's body, which also failed to turn up anything illegal. (Doc. 34 at 72–73).



(Gov. Ex. 1 at Timestamp 20:25:07).

Finally, Special Agent Nathan Burnham, one of the DHS agents on the search-and-seize email, arrived to conduct his own interview of Mr. Tunick. (Gov. Ex. 2 at Timestamp 20:34:57; Doc. 34 at 75; Gov. Ex. 5). FBI Agent Coble joined him, and with Officer Hawkins and Officer Findley in the room, the second interview began with four law enforcement officers surrounding Mr. Tunick:




(Gov. Ex. 2 at Timestamp 20:35:18).[4]

[4] At one point, Officer Castro returns, temporarily bringing the total count of law enforcement officers up to five.

Agent Burnham stated, "You are not under arrest. Once these gentlemen are done with you, pursuant to your entry into the country, you're free to leave." (Gov. Ex. 2 at Timestamp 20:35:15). But he said this *after* the CBP officers had searched Mr. Tunick's belongings and pressured him into providing a cell phone passcode. Moreover, Agent Burnham said Mr. Tunick was free to leave only after "these gentlemen" (the other agents in the room) were done with him. In other words, Mr. Tunick was not free to leave at any time before then.

Mr. Tunick declined to be interviewed and pointed to his attorney's business card, which had already been placed on the table. (Gov. Ex. 2 at Timestamp 20:35:39). Agent Burnham explained that he was seizing Mr. Tunick's electronic devices and that they would be retained for at least 30 days. (Gov. Ex. 2 at Timestamp 20:35:52).

## DISCUSSION

### I. Officers violated Mr. Tunick's Fifth Amendment rights by interrogating him without administering *Miranda* warnings.

CBP officers violated Mr. Tunick's Fifth Amendment rights when they conducted a custodial interrogation without reading him his *Miranda* warnings. The Fifth Amendment provides, among other rights, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To ensure that every citizen can meaningfully exercise this right, "the Supreme Court announced a prophylactic rule to protect against violations of the

Self-Incrimination Clause." *United States v. Morgan*, 143 F.4th 1264, 1273 (11th Cir. 2025) (citation modified).

That rule, announced decades ago in *Miranda v. Arizona*, 384 U.S. 436 (1966), requires that law enforcement officers conducting a custodial interrogation must inform the person that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. The person must also be given the opportunity to exercise those rights throughout the interrogation. *Id.* The fact that an interrogation takes place at the border does not change these rights. *See United States v. Henry*, 604 F.2d 908, 914 (5th Cir. 1979) (holding that noncitizens interrogated at the border are entitled to *Miranda* warnings).[5] The interrogated person may waive these rights (if done knowingly and intelligently), but unless the government can establish that the warnings were given and the rights waived, "no evidence obtained as a result of interrogation can be used against him." *Id.* at 479.

---

[5] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Notably, these requirements—important as they may be—only kick in if an individual is being questioned as part of a "custodial interrogation." *See id.* at 444. Mr. Tunick will begin there.

**a. Mr. Tunick was questioned during a custodial interrogation.**

Mr. Tunick was in custody when CBP officers interrogated him. Whether an individual is "in custody" for purposes of *Miranda* "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (citation modified). While this Court must examine all the circumstances surrounding the interrogation, the ultimate inquiry is whether "there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citation modified). "An interrogation is custodial when under the totality of the circumstances, a reasonable man in [the defendant's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *United States v. Jayyousi*, 657 F.3d 1085, 1109 (11th Cir. 2011). In evaluating whether an individual was in custody, the Eleventh Circuit considers the entire situation, including whether that individual asked to see a lawyer during the interrogation. *See id.* at 1110. This inquiry is objective: it does not

matter what the defendant or the interrogating officer believed about the defendant's freedom to leave. *McDowell*, 250 F.3d at 1362.

There are additional considerations when the interrogation takes place at the border. The Eleventh Circuit has stated that "questioning at the border must rise to a distinctly accusatory level" before a reasonable person would feel restraints on their ability to leave. *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996). The government has the power to police national borders, so the Fifth Amendment guarantee against self-incrimination is not violated by routine questioning of those seeking entry into the United States. *United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982).

Here, Mr. Tunick was in custody. His freedom to move was physically restrained by the CBP officers. An officer, not a civilian, pulled Mr. Tunick from his ordinary travel through the airport. Armed officers isolated him in a private room away from the populace. They repeatedly told Mr. Tunick that they were looking for people with child pornography, had been searching for people who were "involved with pedophiles," and told him that they needed to know "everything." (Gov. Ex. 1 at Timestamp 19:49:04, 19:50:46). Additionally, by telling Mr. Tunick that he could leave once he gave him the information they wanted, it was clear that Mr. Tunick was not free to leave until he answered their questions. This is further confirmed by Agent Burnham telling Mr. Tunick that

he would be free to leave once CBP was finished with him. Mr. Tunick also asked to speak with his lawyer several times during the interview, to no avail, an important factor showing he was in custody.

The agents also accused Mr. Tunick of engaging in criminal conduct, namely violating federal law by possessing child pornography. The agents asked Mr. Tunick if they were going to find "kiddie porn" on his device if they searched it. (Gov. Ex. 1 at Timestamp 19:55:58) And despite his unambiguous denial, Officer Findley asked him again if he had "anything like that" on his phone. (Gov. Ex. 1 at Timestamp 19:56:05). Few (if any) crimes carry more social stigma than crimes against children. By repeatedly accusing him of engaging in such serious crimes, the interrogation was distinctly accusatory.

That this interrogation happened at the border does not change this conclusion. It is true that, as the Eleventh Circuit has acknowledged, "some degree of questioning and of delay is necessary and is to be expected at entry points into the United States." *Moya*, 74 F.3d at 1120. But this was far from the typical questioning and delay that is routine at the border. The CBP officers were instructed to detain Mr. Tunick, search his baggage, retain his electronics, and collect his passcodes. And they were told that Mr. Tunick was under investigation for "suspected terrorist activities." (Gov. Ex. 5). While typical

border inspections might not necessarily implicate the Fifth Amendment, the facts of this case bring it far outside that heartland.

Taken together, the facts show that "a reasonable man in [Mr. Tunick's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *McDowell*, 250 F.3d at 1362 (citation modified). Mr. Tunick was in custody for purposes of the Fifth Amendment and *Miranda*'s protections.

But custody is not enough to trigger *Miranda*. To have been entitled to *Miranda* warnings, Mr. Tunick must have also been interrogated by law enforcement. An individual is interrogated when they are "subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). This includes "any words or actions by the police that they should know are reasonably likely to elicit an incriminating response from the suspect." *Bowen v. Sec'y, Fla. Dep't of Corr.*, 92 F.4th 1328, 1334 (11th Cir. 2024) (citation modified). Here, there can be no doubt that Mr. Tunick was interrogated, as the officers expressly questioned him at length. For these reasons, Mr. Tunick was subjected to a custodial interrogation.

**b. Statements elicited during the custodial interrogation must be suppressed.**

Because the CBP officers did not inform Mr. Tunick of his *Miranda* rights before the custodial interrogation, this Court must suppress the statements

obtained from this unconstitutional interrogation. *See Miranda*, 384 U.S. at 444–45 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."); *Lukehart v. Sec'y, Fla. Dep't of Corr.*, 50 F.4th 32, 42–43 (11th Cir. 2022) (explaining that, pursuant to the holding in *Miranda*, "a statement made by a suspect in custody in response to police interrogation is inadmissible against him at trial unless the police first advised him of his so-called *Miranda* rights").

All verbal statements that Mr. Tunick made to CBP officers should be excluded, including his provision of a phone passcode. "An individual must show three things to fall within the ambit of the Fifth Amendment: (1) compulsion, (2) a testimonial communication or act, and (3) incrimination." *In re Grand Jury Subpoena Duces Tecum*, 670 F.3d 1335, 1341 (11th Cir. 2012). Being forced to provide a passcode to one's phone meets these requirements.

The Eleventh Circuit's case of *In re Grand Jury Subpoena Duces Tecum* is instructive. In that case, John Doe was believed to have distributed child pornography on the internet. *Id.* at 1339. Law enforcement (relying on a search warrant) seized Doe's devices, which included computers and hard drives. *Id.* The FBI attempted to analyze the devices, but they were unable to access some parts of the hard drives. *Id.*

John Doe was served with a subpoena duces tecum ordering him to decrypt the drives and produce their unencrypted contents. *Id.* Doe invoked his Fifth Amendment right against self-incrimination, and after a show cause hearing, the district court held him in contempt. *Id.* at 1340. Doe appealed. *See id.* at 1341.

The Eleventh Circuit held that an individual's act of decrypting and producing a hard drive's contents is sufficiently testimonial to trigger Fifth Amendment protection. *Id.* at 1346. The Court explained that "the decryption and production of the hard drives would require the use of the contents of Doe's mind and could not be fairly characterized as a physical act that would be nontestimonial in nature." *Id.* Moreover, the testimony was not a "foregone conclusion" because the government did not know (1) whether there were files on the hard drive, or (2) where any such files would be located. *Id.* The Eleventh Circuit concluded that the act of decryption and production would be testimonial, which, because the other requirements were met, allowed Doe to invoke the Fifth Amendment's protections. *Id.* at 1349.

Like the decryption of a hard drive, the Fifth Amendment protects the provision of a cell phone passcode, at least when police believe the device contains incriminating information and compel the defendant to provide it. Courts throughout this district have concluded as much. *See, e.g.*, *United States v.*

*Hearst*, No. 1:18-CR-054-RWS-AJB, 2022 WL 16832834, at *21 (N.D. Ga. Mar. 10, 2022) (concluding that law enforcement's asking the defendant for his cell phone passcode without first obtaining his *Miranda* waiver required suppression of his statement providing the passcode), *report and recommendation adopted,* No. 1:18-CR-054-RWS, 2022 WL 8163946 (N.D. Ga. Oct. 14, 2022); *United States v. Sanchez*, 334 F. Supp. 3d 1284, 1295 (N.D. Ga. 2018) (collecting case law indicating that production of a cellphone password is "incriminatory testimony" protected by the Fifth Amendment); *United States v. Mendez-Bernal*, No. 3:19-CR-00010-TCB-RGV, 2020 WL 6495109, at *17 (N.D. Ga. July 22, 2020) (concluding that the defendant, who was in custody, was entitled to *Miranda* warnings, so his act of providing his phone passcode was "due to be suppressed"), *report and recommendation adopted,* No. 3:19-CR-10-TCB, 2020 WL 5494728 (N.D. Ga. Sept. 11, 2020). Furthermore, legal scholarship has had little trouble explaining how decades-long Fifth Amendment case law applies to this 21st Century situation. *See, e.g.*, Laurent Sacharoff, *Unlocking the Fifth Amendment: Passwords and Encrypted Devices*, 87 FORDHAM L. REV. 203, 223 (2018) (explaining that when officers take a suspect into custody and request their passcode, such a request "directly involve[s] testimony in its purest form and therefore should trigger direct Fifth Amendment protections.").

Here, Mr. Tunick was compelled to provide a passcode for a phone that law enforcement believed contained incriminating evidence. Because Mr. Tunick—who was subjected to a custodial interrogation—made statements without first being provided his *Miranda* warnings, this Court must suppress all his statements to the CBP officers, including his provision of the passcode.

**c. The fruits of the custodial statements must also be suppressed.**

In addition to the statements themselves, evidence obtained from Mr. Tunick's phone (or lack thereof) should be suppressed as fruits of his unlawful interrogation. The fruit of the poisonous tree doctrine, which requires suppression of evidence derived from other unlawfully obtained evidence, can apply beyond the Fourth Amendment context. For example—and directly relevant here—evidence derived from an involuntary statement must be excluded from trial as fruit of the poisonous tree. *See United States v. Lall*, 607 F.3d 1277, 1291, 1293 (11th Cir. 2010) (explaining that physical evidence derived from an involuntary confession must be suppressed and reversing the conviction on that basis). The fruits of Mr. Tunick's passcode statement should be suppressed for two independent reasons: (1) the statement was given without *Miranda* warnings, and (2) the statement was involuntary.

To begin, the fruits of Mr. Tunick's statements must be suppressed because they were secured without *Miranda* warnings. Mr. Tunick acknowledges *United*

*States v. Patane*, 542 U.S. 630, 636–37 (2004), which held that the physical fruits of a defendant's un-*Mirandized* statement will not be suppressed solely because the statement was secured without *Miranda* warnings. But *Patane* is distinguishable from Mr. Tunick's case in at least two key ways.

First, unlike in *Patane*, where the defendant interrupted the detective while he was administering his *Miranda* rights and the defendant never invoked his right to an attorney, the CBP officers never attempted to advise Mr. Tunick of his *Miranda* rights and ignored his repeated requests to speak with his attorney. This important difference alone brings the case outside *Patane*'s purview. *See United States v. Owens*, No. 5:09-CR-14/RS, 2009 WL 2584570, at *4 (N.D. Fla. Aug. 20, 2009) (determining that *Patane* was not controlling because the officers never attempted to advise Mr. Owens of his *Miranda* rights). Second, the officers' search and seizure of Mr. Tunick's phone was significantly more intrusive than the seizure of Patane's firearm. *See Riley v. California*, 573 U.S. 373 (2014). Unlike the search of a bag or physical items, a cell phone can reveal the "sum of an individual's private life." *Id.* at 393–94.

For these reasons, *Patane* is factually inapposite. As such, Mr. Tunick's phone and its contents—or more accurately, his alleged "wiping" of the contents of the phone by providing a specific password to the officers—should be suppressed as fruits of Mr. Tunick's unlawful interrogation.

The fruits of Mr. Tunick's passcode statement must be suppressed for a second reason: his statement was involuntary. The focus of the voluntariness inquiry is whether the defendant's will was overborne such that his statement was not the product of free choice. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973). When evaluating the voluntariness of a statement, courts must consider the totality of the circumstances surrounding the statement. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hearst*, 2022 WL 16832834, at *21.

On balance, these factors indicate that Mr. Tunick's passcode statement was not voluntary. He was detained after an international flight and peppered with law enforcement's questions. The interrogation happened in a private room, where armed officers demanded answers to their questions and repeatedly suggested that he either possessed child pornography or knew someone who did. The officers presented Mr. Tunick with no real options: either provide the passcode now or wait for an unknown period of time for law enforcement to crack the devices themselves. And finally, law enforcement told him that the sooner he gave them the information they sought—including the passcode to his cell phone—the sooner he could leave. When Mr. Tunick finally acquiesced and

gave law enforcement the passcode, he did not do so voluntarily. Any physical evidence derived from that statement should be suppressed.

## II. Officers violated Mr. Tunick's Fifth and Sixth Amendment rights by ignoring his repeated requests to speak to his attorney.

Mr. Tunick's constitutional rights were violated when he was repeatedly denied the right to speak to his attorney. As explained above, Mr. Tunick was subjected to a custodial interrogation, entitling him to *Miranda* warnings that he was never given. As *Miranda* makes clear, Mr. Tunick had "the right to consult with a lawyer and to have the lawyer with him during interrogation." *See Miranda*, 384 U.S. at 471. That right, designed to give force to the interrogated person's Sixth Amendment right to counsel, reminds defendants that they have the right to have an attorney present during their interrogation.

Mr. Tunick attempted to exercise this right. He repeatedly asked for his attorney throughout the interrogation, and the interview should have stopped the first time he did so. *See Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (explaining that, even in cases where *Miranda* warnings are given, "if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present"). But the officers refused to stop, electing instead to ignore his requests and tell him he could not call his lawyer during the interrogation. (*See, e.g.*, Gov. Ex. 1 at Timestamp 20:01:30).

That was unconstitutional. The Supreme Court has "set forth a bright-line rule that *all* questioning must cease after an accused requests counsel." *Smith v. Illinois,* 469 U.S. 91, 98 (1984) (citation modified). To decide whether this rule was violated, this Court must conduct a two-step inquiry. The first question is whether the defendant "actually invoked his right to counsel." *Everett v. Sec'y, Fla. Dep't of Corr.*, 779 F.3d 1212, 1241 (11th Cir. 2015) (quoting *Smith*, 469 U.S. at 95). If the answer to that question is yes, "courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith*, 469 U.S. at 95.

Here, Mr. Tunick unequivocally—and repeatedly—invoked his right to counsel. He told the CBP officers that he did not want to speak without a lawyer and wanted to call his attorney. And as the video of the interrogation makes clear, Mr. Tunick did not initiate discussions with the officers after these invocations; the officers initiated further discussion with him.

Because the officers overstepped this bright-line, any statements made after his invocation of the right to counsel must be suppressed.

### III. The evidence obtained from Mr. Tunick's cell phone should be suppressed as the product of an unreasonable search under the Fourth Amendment.

Mr. Tunick's cell phone was searched in violation of the Fourth Amendment, and any evidence obtained from that search must be suppressed. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. IV.

As an initial matter, law enforcement officers conducted a search when they took Mr. Tunick's phone and entered the passcode. A search for Fourth Amendment purposes occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Odoni*, 782 F.3d 1226, 1237 (11th Cir. 2015) (citation omitted). Mr. Tunick had both a subjective and objective expectation of privacy in his cell phone, an object that contains "[t]he sum of an individual's private life." *Riley*, 573 U.S. at 394. The officers infringed on that expectation of privacy when they took Mr. Tunick's device and typed in the password he provided. That law enforcement says they were unable to get any information from the device does not change that fact. *See Arizona v. Hicks*, 480 U.S. 321, 325 (1987) ("A search is a search, even if it happens to disclose nothing but the bottom of a turntable.").

The question, then, is whether the search was reasonable. For a search to be reasonable under the Fourth Amendment, law enforcement must typically obtain a judicial warrant. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). As such, the general rule is that a warrantless search is presumptively unreasonable. *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). That general rule should apply here.

**a. Law enforcement's search of Mr. Tunick's cell phone was unreasonable.**

The CBP officers conducted an unreasonable search of Mr. Tunick's phone. Generally, the Eleventh Circuit applies a two-step analysis to evaluate the legality of a border search. *United States v. Pulido*, 133 F.4th 1256, 1273 (11th Cir. 2025). The first step focuses on whether there was statutory authority to conduct the search, and the second step asks whether the search was reasonable under the Fourth Amendment. *Id.* Assuming that the officers had the authority to conduct the search, the search was still unreasonable under the Constitution.

Even with the unique governmental needs that exist at the border, officers needed probable cause to believe Mr. Tunick committed a crime before they could search his device. Our cell phones contain vast amounts of personal information on them. Few things are more intrusive than law enforcement having unfettered access to that data. Considering the significant intrusion that a

search of one's cell phone necessarily imposes, officers should not have been permitted to conduct a targeted, non-routine search without probable cause.

Recent case law on the uniquely private nature of cell phones confirms that conclusion. In *Riley v. California*, 573 U.S. 373, 386 (2014), the Supreme Court held that officers could not search the digital information of a defendant's cell phone without first securing a warrant. Recognizing the wealth of private information contained on an individual's cell phone—including data like addresses, prescriptions, and bank statements—the Supreme Court ruled that law enforcement could not get access to this information by simply pointing to a Fourth Amendment exception (in that case, the exception for searches incident to arrest). *Riley*, 573 U.S. at 394–95, 401. Rather, the Supreme Court's "answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant." *Id.* at 403.

Since *Riley*, the Supreme Court has continued to emphasize the incomparably private nature of cell phones. For example, location information derived from an individual's cell phone can be used to create "an all-encompassing record of the holder's whereabouts," requiring the government to obtain a warrant supported by probable cause before it can get that information. *Carpenter v. United States*, 585 U.S. 296, 311, 316–20 (2018). And just a few months ago, the Supreme Court ruled that, considering the private information that can

be gathered from each person's regular use of their cell phone, law enforcement must get a warrant, supported by probable cause, before they can get data about your cell phone's location from a third-party tech company. *Chatrie v. United States*, 609 U.S. 605, 637–38 (2026).

As these cases illustrate, cell phones are unique in their capabilities, storing massive amounts of data about each of our private lives. Given the significant privacy intrusions inherent in every law enforcement search of a cell phone, officers must have probable cause before they can search one's device at the border.

That being said, Eleventh Circuit case law points in the other direction. Under Supreme Court case law, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). This rule primarily stems from the government's need to prevent the possible introduction of contraband into the nation. *See id.* at 537. Nonetheless, the Eleventh Circuit has held that a forensic search of electronic devices at the border is constitutional despite the lack of a warrant, probable cause, or individualized suspicion. *United States v. Touset*, 890 F.3d 1227, 1233–34 (11th Cir. 2018).

Mr. Tunick acknowledges that *Touset* likely forecloses this argument. But *Touset* does not accord with the primary justification for warrantless border

searches. The notion that suspicionless searches of phones at the border can prevent contraband from entering the country fails to grapple with the reality of digital crime. Unlike physical contraband like drugs, digital contraband can exist in multiple locations and formats, and is easily transported across borders via the internet.

This Court need look no further than the facts of this case to see how and why *Touset* takes this exception too far. In the case of Mr. Tunick, where the sole allegation is that he destroyed the digital contents of his phone, where was the threat of contraband entering the country? There wasn't one. The government's interest in stopping illegal contraband is not implicated here, where a U.S. citizen was stopped at the border and subject to intrusive searches based on no more than law enforcement hunches. And this is especially troubling considering that the CBP officers admit they had no reason to believe that Mr. Tunick actually committed the crimes they falsely accused him of.

While the Eleventh Circuit's decision in *Touset* suggests that it is permissible for law enforcement to circumvent a person's constitutional rights by investigating domestic crime through warrantless, non-routine searches at the border, other circuits disagree, requiring individualized suspicion before such non-routine searches can occur. For example, the Fourth Circuit has held that "a forensic border search of a phone must be treated as nonroutine, permissible

only on a showing of individualized suspicion." *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018), *as amended* (May 18, 2018). Similarly, the First Circuit requires that a non-routine border search be supported by reasonable suspicion that the search will uncover contraband or evidence of a crime. *United States v. Qin*, 57 F.4th 343, 346–47 (1st Cir. 2023).

Moreover, while *routine* border searches may not require probable cause, *see Montoya de Hernandez,* 473 U.S. at 538, there was nothing routine about the search in this case. Here, law enforcement coordinated and planned Mr. Tunick's detention before he arrived at the airport. Mr. Tunick has not been charged with committing any "terroristic" acts, but law enforcement took advantage of the relaxed constitutional protections at the border to try and dig up evidence against Mr. Tunick that they hoped existed. Nothing about this search was routine, and agents should not have conducted it without the requisite suspicion.

## CONCLUSION

There can be no debate: the government has a "strong governmental interest in controlling the borders." *Moya*, 74 F.3d at 1119. But the way it does so matters. When Mr. Tunick landed at Hartsfield-Jackson International Airport, he was entitled to the protections guaranteed to him by the Fourth, Fifth, and Sixth Amendments to the Constitution. But the government—focusing on its interests

and ignoring Mr. Tunick's—denied him those protections. It should not now be rewarded for that decision.

Mr. Tunick respectfully requests that the Court (1) issue an order suppressing all unconstitutionally obtained statements and evidence, and (2) grant such other relief as may be just under the circumstances of this case.

Dated: This 19th Day of October, 2026.

Respectfully Submitted,

*/s/ Jaster Wesley Francis, Jr.*
Jaster Wesley Francis, Jr.
Georgia State Bar No. 994359

*/s/ Melissa McGrane*
Melissa McGrane
Georgia State Bar No. 878384

*/s/ Joe Austin*
Joe Austin
Georgia State Bar No. 176460

Federal Defender Program, Inc.
(404) 688-7530; Fax: (404) 688-0768
Jaster_Francis@fd.org
Melissa_McGrane@fd.org
Joe_Austin@fd.org